Eric J. Buescher (Bar No. 271323)
eric@baykeeper.org
Nicole C. Sasaki (Bar No. 298736)
nicole@baykeeper.org
SAN FRANCISCO BAYKEEPER
1736 Franklin Street, Suite 800
Oakland, California 94612
Telephone: (510) 735-9700
Facsimile: (510) 735-9160

Attorneys for Plaintiff
SAN FRANCISCO BAYKEEPER

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, INC., a California non-profit corporation,<br><br>Plaintiff,<br>v.<br><br>RADIUS RECYCLING, INC. f.k.a. SCHNITZER STEEL INDUSTRIES, INC., U-PULL-IT, INC., PICK-N-PULL SAN JOSE AUTO DISMANTLERS, a California General Partnership, PICK-N-PULL AUTO DISMANTLERS, OAKLAND, a California General Partnership, PICK-N-PULL AUTO DISMANTLERS, LLC, PICK-N-PULL AUTO DISMANTLERS, a California General Partnership, NORPROP, INC., and PICK AND PULL AUTO DISMANTLING, INC.,<br><br>Defendants. | Civil No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>1. **Clean Water Act – Stormwater Discharges without Complying with Technology Based Effluent Limitations**<br>2. **Clean Water Act – Discharges of Stormwater in Violation of Receiving Water Limitations**<br>3. **Clean Water Act – Failure to Have a Valid Storm Water Pollution Prevention Plan**<br>4. **Clean Water Act – Failure to Conduct Monitoring and Reporting**<br>5. **Failure to Conduct Exceedance Response Action Reports**<br>6. **Clean Water Act – Falsely Certifying Annual Reports**<br>7. **Unfair Competition Law – Unlawful Conduct under Bus. & Prof. Code § 17200 (Fish & Game Code §§ 5650 and 5652)**<br>8. **Unfair Competition Law – Unlawful Conduct under Bus. & Prof. Code § 17200 (Fish & Game Code § 1602)** |

COMPLAINT

COMPLAINT

Plaintiff San Francisco Baykeeper ("Baykeeper"), by and through its counsel, alleges as follows:

## I. INTRODUCTION

1. This is a third-party enforcement action, brought pursuant to section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a)(1), to address violations of the CWA by Defendants Schnitzer Steel Industries, Inc. d/b/a Radius Recycling, Inc., U-Pull-It, Inc., Pick-N-Pull San Jose Auto Dismantlers, a California General Partnership, Pick-N-Pull Auto Dismantlers, Oakland, a California General Partnership, Pick-N-Pull Auto Dismantlers, LLC, Pick-N-Pull Auto Dismantlers, a California General Partnership, Norprop, Inc., and Pick and Pull Auto Dismantling, Inc. (collectively, "Defendants") arising out of Defendants operations (automobile dismantling) at Pick N Pull Fairfield 11 operated at 4659 Air Base Parkway, Fairfield, California ("PNP Fairfield"), Pick N Pull Richmond operated at 1015 Market Avenue, Richmond, California ("PNP Richmond"), PickNPull Oakland 70 operated at 8451 San Leandro Street, Oakland, California ("PNP Oakland"), and Pick-N-Pull Newark #43, operated at 7400 Mowry Avenue, Newark, California ("PNP Newark") ("Facilities"). Since on or before October 27, 2018, Defendants have been discharging and continue to discharge polluted stormwater from the Facilities, in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342. Since on or before October 27, 2018, Defendants have also violated the General Industrial Stormwater Permit issued by the State of California, NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 2014-0057-DWQ as amended by Order No. 2015-0122-DWQ in 2015 and 2018 ("Industrial Stormwater Permit"). Baykeeper seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendants' repeated and ongoing violations of the CWA.

## II. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over the parties and this action pursuant to section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), 28 U.S.C. § 1331 (an action arising

COMPLAINT                                                                                              1

under the laws of the United States), and 28 U.S.C. § 2201 (declaratory relief).

3. On or about October 27, 2023, Baykeeper provided notice of intent to file suit against Defendants for Defendants' CWA violations ("Notice Letter") to the Administrator of the United States Environmental Protection Agency (EPA); the Regional Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") (collectively, "state and federal agencies"), and Defendants, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A). A copy of the Notice Letter is attached as Exhibit 1.

4. More than sixty (60) days have passed since the Notice Letter was mailed to Defendants and the state and federal agencies. Neither EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5. Venue is proper in the Northern District of California pursuant to section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

6. Intradistrict assignment of this matter to the San Francisco or Oakland Division of the Court is appropriate pursuant to Civil Local Rule 3-2(d). The events or omissions which give rise to Baykeeper's claims occurred in Alameda County, which is under the jurisdiction of the San Francisco or Oakland Division of the Northern District of California.

### III. PARTIES

#### A. Plaintiff

7. Plaintiff Baykeeper, d/b/a San Francisco Baykeeper, is a non-profit public benefit corporation organized under the laws of the State of California with its main office at 1736 Franklin Street, Suite 800, Oakland, California 94612. Baykeeper's approximately 3,500 members live and/or recreate in and around the San Francisco Bay area. Baykeeper's mission is to defend San Francisco Bay from the biggest threats and hold polluters and government agencies accountable to create healthier communities and help wildlife thrive. Its team of scientists and

lawyers investigate pollution via aerial and on-the-water patrols, strengthen regulations through science and policy advocacy, and enforce environmental laws on behalf of the public. To further its mission, Baykeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

8. Members of Baykeeper reside in Fairfield, Richmond, Oakland, and Newark, California, as well as in many of the surrounding communities. Members of Baykeeper, including citizens, taxpayers, property owners, and residents, live, work, and travel near, and recreate in, San Francisco Bay and its tributaries, into which Defendants discharge pollutants. Baykeeper's members use and enjoy San Francisco Bay and its tributaries for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes. Baykeeper's members' use and enjoyment of these waters are negatively affected by the pollution caused by the Facilities' operations. Defendants' discharges of stormwater containing pollutants impair each of these uses and thus harms Baykeeper and its members. Thus, the interests of Baykeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and the Industrial Stormwater Permit.

9. Baykeeper members use the areas downstream of the Facilities including in and along Suisun Marsh Wetlands, Suisun Bay, San Pablo Bay, San Leandro Bay, Mowry Slough, and San Francisco Bay to bird watch, view wildlife, fish, kayak, sail, boat, stand up paddleboard, wade and swim, hike, bike, walk, run, and sightsee, as well as for aesthetic enjoyment. Additionally, Baykeeper and its members use local waters to engage in educational and scientific study through pollution and habitat monitoring and restoration activities.

10. The Facilities' historic and ongoing discharges of pollutants into the unnamed tributary of Union Creek, Union Creek, Hill Slough, Suisun Slough, Suisun Marsh Wetlands, Suisun Bay, Wildcat Creek, San Pablo Bay, Elmhurst Creek, San Leandro Bay, Mowry Slough, and San Francisco Bay in violation of the Clean Water Act have, are, and continue to adversely affect the interests of Baykeeper and its members.

11. The interests of Baykeeper's members have been, are being, and will continue to be

adversely affected by Defendants' failure to comply with the Clean Water Act. The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

12. Baykeeper has one or more members who use, explore, and recreate in areas impacted by the by the stormwater pollution herein at issue and could sue in their own right.

13. Baykeeper brings this action on behalf of itself and its members. Neither the claims brought by Baykeeper nor the relief Baykeeper requests requires the participation of individual members.

14. Baykeeper's injuries-in-fact are fairly traceable to Defendants' conduct and would be redressed by the requested relief.

15. Defendants' continuing failure to comply with the Clean Water Act and federal laws and regulations relating to the protection of waters of the United States has harmed, and will continue to directly and substantially harm, the interests of Baykeeper's members', hundreds of species of wildlife, and residents of the Bay Area. A decree declaring Defendants to have violated the Clean Water Act, and granting the various other remedies sought herein, will redress Baykeeper's harms.

16. Some of Baykeeper's members will suffer recreational, aesthetic, or other environmental injuries due to Defendants' pollution. Baykeeper's members use and enjoy San Francisco Bay and its tributaries for recreational, scientific, and aesthetic purposes and would reasonably cease these activities should San Francisco Bay's water quality become too degraded.

17. Defendants' stormwater pollution frustrates Baykeeper's mission. Baykeeper has diverted its limited resources to investigate, research, gather documents from regulatory agencies, and consult with experts in order to understand the extent of the harm Defendants' ongoing pollution causes in and around the unnamed tributary of Union Creek, Hill Slough, Suisun Slough, Suisun Marsh Wetlands, Suisun Bay, Wildcat Creek, San Pablo Bay, Elmhurst Creek, San Leandro Bay, Mowry Slough, and San Francisco Bay. Baykeeper has dedicated substantial resources and time into its works and investigation regarding Defendants' stormwater pollution. At the time Baykeeper undertook its investigation into the Facility, the resources spent were not related to any litigation. Baykeeper would have used its limited resources on other matters had it

not been for Defendants' conduct.

18. Continuing the commission of the acts and omissions alleged herein will cause irreparable harm to Baykeeper and its members, for which there is no adequate remedy at law.

**B. Defendants**

19. Since the transmission of the Notice Letter, Defendant Schnitzer Steel Industries, Inc. has legally changed its name to Radius Recycling, Inc. Radius Recycling, Inc. is an active corporation registered in Oregon, whose principal address is 299 SW Clay Street, Suite 400, Portland, Oregon 97201. Radius Recycling, Inc.'s registered agent is C T Corporation System 330 N Brand Boulevard, Glendale, California 91203. Upon information and belief, Radius Recycling, Inc. (previously known as Schnitzer Steel Industries, Inc.) is the parent company to: Norprop, Inc.; Pick and Pull Auto Dismantling, Inc.; Pick-N-Pull Auto Dismantlers, LLC; Pick-N-Pull Auto Dismantlers, a California General Partnership; Pick-N-Pull Auto Dismantlers, Oakland, a General Partnership; Pick-N-Pull San Jose Auto Dismantlers, a California General Partnership, and U-Pull-It, Inc.[1] Upon information and belief, Schnitzer Steel Industries, Inc. has been a corporate owner of the Facilities since at least October 27, 2018. Upon information and belief, Schnitzer Steel Industries, Inc. has been a corporate operator of the Facilities since at least October 27, 2018. Upon information and belief, in July 2023, Schnitzer Steel Industries, Inc. rebranded as Radius Recycling, Inc., and it completed its corporate name change with the California Secretary of State on February 9, 2024.

20. Defendant U-Pull-It, Inc. is an active corporation registered in California, whose principal address is 299 SW Clay Street, Suite 400, Portland, Oregon 97201. U-Pull-It, Inc.'s registered agent is C T Corporation System 330 N Brand Boulevard, Glendale, California 91203. Upon information and belief, it is a wholly owned subsidiary of Schnitzer Steel Industries, Inc. Upon information and belief, U-Pull-It, Inc. has been an owner of PNP Fairfield and PNP Richmond since at least October 27, 2018. The September 27, 2018 "Notice of Intent" for PNP

---

[1] As of February 20, 2024, www.picknpull.com states: "Pick-n-Pull Auto and Truck Dismantlers, a subsidiary of Radius Recycling." As of February 20, 2024, https://radiusrecycling.com/locations includes PNP Fairfield, PNP Newark, PNP Oakland, and PNP Richmond as auto recycling sites in Radius Recycling's Location List.

Fairfield to comply with the terms of the Industrial Stormwater Permit and each annual report filed for PNP Fairfield since 2018 pursuant to the Industrial Stormwater Permit named U Pull It Inc as the owner of PNP Fairfield. The September 27, 2018 "Notice of Intent" for PNP Richmond to comply with the terms of the Industrial Stormwater Permit and each annual report filed for PNP Richmond since 2018 pursuant to the Industrial Stormwater Permit named U Pull It Inc as the owner of PNP Richmond. Upon information and belief, U-Pull-It, Inc. has been an operator of PNP Fairfield and PNP Richmond since at least October 27, 2018.

21.        Defendant Pick-N-Pull San Jose Auto Dismantlers, a California General Partnership, is a General Partnership incorporated in California, whose address is 1065 Commercial Street, San Jose, California 95112. Upon information and belief, it is also a wholly owned subsidiary of Schnitzer Steel Industries, Inc. Upon information and belief, Pick-N-Pull San Jose Auto Dismantlers, a California General Partnership, has been an owner of PNP Newark since at least October 27, 2018. The September 27, 2018 "Notice of Intent" for PNP Newark to comply with the terms of the Industrial Stormwater Permit and each annual report filed for the PNP Newark since 2018 pursuant to the Industrial Stormwater Permit named Pick N Pull San Jose Auto Dismantler General Partnership as the owner of the PNP Newark. Upon information and belief, Pick-N-Pull San Jose Auto Dismantlers, a California General Partnership, has been an operator of PNP Newark since at least October 27, 2018.

22.        Defendant Pick-N-Pull Auto Dismantlers, Oakland, a General Partnership, is a General Partnership incorporated in California, whose address is 10850 Gold Center Drive, Suite 325, Rancho Cordova, California 95670. Upon information and belief, it is also a wholly owned subsidiary of Schnitzer Steel Industries, Inc. Upon information and belief, Pick-N-Pull Auto Dismantlers, Oakland, a California General Partnership, has been an owner of PNP Oakland since at least October 27, 2018. The September 27, 2018 "Notice of Intent" for PNP Oakland to comply with the terms of the Industrial Stormwater Permit and each annual report filed for the PNP Oakland since 2018 pursuant to the Industrial Stormwater Permit named Pick n Pull Auto Dismantlers Oakland General Partnership as the owner of the PNP Oakland. Upon information and belief, Pick-N-Pull Auto Dismantlers, Oakland, a California General Partnership, has been an

operator of PNP Oakland since at least October 27, 2018.

23. Defendant Pick-N-Pull Auto Dismantlers, LLC is an active limited liability company formed in California, whose principal address is 299 SW Clay Street, Suite 350, Portland, Oregon 97201. Pick-N-Pull Auto Dismantlers, LLC's registered agent is C T Corporation System 330 N Brand Boulevard, Glendale, California 91203. Pick-N-Pull Auto Dismantlers, LLC is a wholly owned subsidiary of Schnitzer Steel Industries, Inc. and an authorized partner of Pick-N-Pull Auto Dismantlers (A California Partnership). Upon information and belief, Pick-N-Pull Auto Dismantlers, LLC has been a corporate owner of the Facilities since at least October 27, 2018. Upon information and belief, Pick-N-Pull Auto Dismantlers, LLC has been a corporate operator of the Facilities since at least October 27, 2018.

24. Defendant Pick-N-Pull Auto Dismantlers, a California General Partnership is a General Partnership incorporated in California. Upon information and belief, Pick-N-Pull Auto Dismantlers, a California General Partnership, is a wholly owned subsidiary of Schnitzer Steel Industries, Inc. The authorized partners of Pick-N-Pull Auto Dismantlers, a California General Partnership, are: Norprop, Inc., Pick-N-Pull Auto Dismantlers, LLC, and Pick and Pull Auto Dismantling, Inc. Upon information and belief, Pick-N-Pull Auto Dismantlers, a California General Partnership, has been a corporate owner of the Facilities since at least October 27, 2018. Upon information and belief, Pick-N-Pull Auto Dismantlers, a California General Partnership, has been a corporate operator of the Facilities since at least October 27, 2018.

25. Defendant Norprop, Inc. is an active corporation registered in California and Oregon, whose principal address is 299 SW Clay Street, Suite 400, Portland, Oregon 97201. Norprop, Inc.'s registered agents are: C T Corporation System, 330 N Brand Boulevard, Suite 700, Glendale, California 91203, and C T Corporation System, 780 Commercial Street SE, Suite 100, Salem, Oregon 97301. Norprop, Inc. is a wholly owned subsidiary of Schnitzer Steel Industries, Inc. and an authorized partner of Pick-N-Pull Auto Dismantlers, a California General Partnership. Upon information and belief, Norprop, Inc. has been a corporate owner of the Facilities since at least October 27, 2018. Upon information and belief, Norprop, Inc. has been a corporate operator of the Facilities since at least October 27, 2018.

26.          Defendant Pick and Pull Auto Dismantling, Inc. is an active corporation registered in California, whose principal address is 299 SW Clay Street, Suite 350, Portland, Oregon 97201. Pick and Pull Auto Dismantling, Inc.'s registered agent is C T Corporation System, 330 N Brand Boulevard, Glendale, California 91203. Upon information and belief, Pick and Pull Auto Dismantling, Inc. is a wholly owned subsidiary of Schnitzer Steel Industries, Inc. and an authorized partner of Pick-N-Pull Auto Dismantlers, a California General Partnership. Upon information and belief, Pick and Pull Auto Dismantling, Inc. has been a corporate owner of the Facilities since at least October 27, 2018. Upon information and belief, Pick and Pull Auto Dismantling, Inc. has been a corporate operator of the Facilities since at least October 27, 2018.

27.          Defendants own and/or operate self-service auto dismantling operations. The Facilities' operations include draining fluids from newly received end-of-life vehicles; mounting drained vehicles on stands in the customer yard for customer access; removing radiators and cores from picked-over vehicles; crushing vehicle bodies prior to transport to a metal recycling facility and loading core parts and tires onto separate trucks for off-site recycling. The Facilities also sell a small number of used cars, car batteries, and tires. Customer activities such as vehicle parts pulling and sales transactions are done within the customer yard and sales area, respectively. Known and potential pollutants from the Facilities' operations include lead, oil and grease, aluminum, total suspended solids (TSS), iron, chemical oxygen demand (COD), zinc, cadmium, copper, mercury, selenium, windshield wiper fluid, used oil filters, used absorbent with gasoline, universal e-waste, road flares, oily absorbents and debris, nickel metal hydride battery (EV), mercury switches, lithium-ion batteries (EV), pesticides/herbicides, gasoline, crusher fluid, used oils, lead acid batteries, diesel fuel, and brake fluid.

### C.     The Facilities

#### 1.   PNP Fairfield

28.          PNP Fairfield is approximately 14 acres. Approximately 12 acres are exposed to stormwater. The site is surrounded by undeveloped open fields to the east and west, new road construction to the south, and an automobile repair shop and an auto glass store to the north, which share an ingress and egress via Wiley Lane and customer parking with PNP Fairfield.

COMPLAINT                                                                                                    8

29. PNP Fairfield has two drainage areas. Eastern Drainage Area 1 receives stormwater run-off from the eastern half of the customer yard and parking lot. Stormwater from this area flows into a vegetated swale along the eastern property boundary, routing flow from this area to the southeastern corner of the site, at DP-1. Western Drainage Area 2 receives stormwater run-off from the western half of the customer yard and production yard. Stormwater from this area is directed to a vegetated swale along the western property boundary, and discharges at the end of the swale at the northwestern corner of the site at DP-2. Three concrete stormwater drain inlets equipped with concrete aprons were recently installed along the western swale, and four gravel drop inlets were installed recently along the eastern swale. Oil/water separators (one in each drainage area) remove debris, oil, and grease prior to routing industrial stormwater to the swales. Industrial stormwater is indirectly discharged at DP-1 to the unnamed tributary of Union Creek, then Union Creek, then Hill Slough, then Suisun Slough, then to the Suisun Marsh Wetlands, then Suisun Bay. Industrial stormwater is discharged to land off site at DP-2. PNP Fairfield is 3 miles away from the Suisun Marsh Wetlands and 19 miles from Suisun Bay.

30. Suisun Marsh Wetlands are impaired for low oxygen, mercury, nitrogen/phosphorus, and salts.

31. Suisun Bay is impaired for dioxins, mercury, non-native aquatic plants, PBCs, selenium, and pesticides.

2. PNP Richmond

32. PNP Richmond is approximately 10.75 acres. Approximately 9 acres are exposed to stormwater. The site is bordered to east by railroad tracks, to the south by Market Avenue, to the west by private storage and railroad tracks, and to the north by American Iron & Metal, a recycling center. The site is divided into two areas by Wildcat Creek.

33. PNP Richmond has three drainage areas. Drainage Area 1 includes the Production Yard; Drainage Area 2 includes the Customer Yard, and Drainage Area 3 includes the customer parking lot, which PNP Richmond claims is non-industrial. Stormwater from Drainage Area 1 is directed to a retention pond at the northern tip of the site. In 2022, PNP Richmond removed discharge point DP-2, asserting the retention pond for Drainage Area 1 does not discharge.

Stormwater from Drainage Area 2 and Drainage Area 3 is directed to a treatment system that discharges at DP-1 to Wildcat Creek, then the Wildcat Creek Wetlands, then to San Pablo Bay. PNP Richmond is 2.5 miles from San Pablo Bay.

### 3. PNP Oakland

34. PNP Oakland is approximately 7 acres. Approximately 5 acres are exposed to stormwater. The site is bordered to the northeast by San Leandro Street, to the southeast by 85th Avenue, to the southwest by railroad tracks, and to the northwest by Monterey Mechanical Co., a metal fabricator.

35. PNP Oakland has two drainage areas. Drainage Area 1 includes all industrial areas of the site. Stormwater in Drainage Area 1 is routed through subsurface pipes to an oil/water separator and active treatment system, including aboveground equalization tanks, flocculant, settling tanks, pH adjustment, media filtration, and carbon filters, and discharges to Outfall #1 to Oakland's municipal separate storm sewer system, then to Elmhurst Creek, and then to San Leandro Bay, near Arrowhead Marsh, then to Lower San Francisco Bay. The Facility is 1.25 miles from San Leandro Bay. Drainage Area 2 is the non-industrial customer parking lot.

### 4. PNP Newark

36. PNP Newark is approximately 19 acres. Approximately 16 acres are exposed to stormwater. The site is bordered by undeveloped open fields to the north, east, and south, and by Mowry Avenue to the west.

37. PNP Newark has three drainage areas. Drainage Area 1 is the southern portion of the site, routing stormwater through a subsurface pipe to Pond A, which discharges at DP-1. Drainage Area 2 collects stormwater runoff from the northern portion of the site, routing it through subsurface pipes to Pond B, which discharges at DP-2. Both DP-1 and DP-2 discharge to an adjacent marshy area, which drains into Mowry Slough, then to South San Francisco Bay at the Don Edwards San Francisco Bay National Wildlife Refuge. PNP Newark is 0.25 miles away from Mowry Slough, and 6 miles away from South San Francisco Bay. Drainage Area 3 is non-industrial customer parking, and mostly drains to Drainage Area 2 and Pond B. Stormwater from this area drains to Mowry Avenue and then to the Newark municipal separate storm sewer system.

38.    When, in this complaint, reference-is made to any act of the Defendants, such allegations shall be deemed to mean that the officers, directors, agents, employees, or representatives of said defendants did, or authorized such acts, or failed to adequately or properly supervise, control or direct their employees and agents while engaged in the management, direction, operation, or control of the affairs of said business organization, and did so while acting in the scope of their employment or agency.

## IV.    REGULATORY BACKGROUND

### A.    The Problem of Stormwater Pollution

39.    Stormwater runoff is one of the most significant sources of water pollution in the nation and has been recognized as a leading cause of significant and cumulative harmful impacts to the water quality of San Francisco Bay. With every rainfall event, hundreds of millions of gallons of polluted rainwater flow from local industrial facilities, such as the Facilities, and pour into storm drains, local waterways, wetlands, and San Francisco Bay.

40.    The consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering local creeks, rivers, and coastal waters each year.

41.    The unnamed tributary of Union Creek, Union Creek, Hill Slough, Suisun Slough, Suisun Marsh Wetlands, Suisun Bay, Wildcat Creek, San Pablo Bay, Elmhurst Creek, San Leandro Bay, Mowry Slough, and San Francisco Bay and their connected surface waters are ecologically sensitive areas and are essential habitat for numerous cetacean, fish, bird, and other species.

42.    These waters also provide recreational activities, including fishing, swimming, surfing, kayaking, and boating. They also provide non-contact recreational and aesthetic opportunities such as biking, wildlife observation, educational activities, and opportunities for research.

43.    Industrial facilities like Defendants' that discharge stormwater contaminated with sediment, heavy metals, and other pollutants contribute to impairment of waters and aquatic dependent wildlife, expose the people of Fairfield, Richmond, Oakland, and Newark to toxins, and

harm the special social, economic, and aesthetic benefits San Francisco Bay Area waters have for locals and visitors from around the world.

44. Stormwater runoff from industrial sites such as the Facilities causes harm to humans and aquatic life. In particular, stormwater can contain heavy metal pollutants such as aluminum, cadmium, copper, iron, lead, mercury, nickel, selenium, tin, and zinc, as well as high concentrations of TSS, and COD. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological, physiological, and reproductive effects. Heavy metals have been shown to alter activity in tissues and blood of fish.

45. High concentrations of TSS degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS have been shown to alter predator-prey relationships (for example, turbid water might make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons (PAHs), are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

46. Controlling polluted storm water and non-storm water discharges is essential to protecting the San Francisco Bay Area's surface waters.

**B.  The Clean Water Act**

47. The Clean Water Act is the primary federal statute protecting surface waters in the United States. The CWA aims to prevent, reduce, and eliminate pollution in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a)

48. In order to accomplish that goal, section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharger complies with other enumerated sections of the CWA, including the prohibition on discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES")

permit issued pursuant to section 402, 33 U.S.C. § 1342(b). *See also* 40 C.F.R. § 122.26(c)(1) and Industrial Stormwater Permit, § I.A.12.

49. The CWA requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

50. The "discharge of a pollutant" means, among other things, the addition of a pollutant to "waters of the United States" from any "point source." 40 C.F.R. § 122.2.

51. The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); 40 C.F.R. § 122.2.

52. The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

53. CWA section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved permit program for discharges. In California, EPA has approved the State Board and its nine Regional Boards to administer a NPDES permit program for the State. The State Board and Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

54. CWA section 402(p), 33 U.S.C. § 1342(p), requires that NPDES permits be issued for stormwater discharges "associated with industrial activity."

55. CWA section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable (BAT) for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology (BCT) for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

56. CWA section 505(a)(1) provides for citizen enforcement against any "person" who

is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1), 1365(f).

57. A "person" under the CWA includes individuals, corporations, partnerships, associations, States, municipalities, commissions, and political subdivisions of a State, or any interstate body. 33 U.S.C. § 1362(5). Defendant is a person under the CWA.

58. "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges, and (b) any condition of an NPDES permit such as the Industrial Stormwater Permit. 33 U.S.C. § 1365(f); *Citizens for a Better Env't v. Union Oil Co.*, 83 F.3d 1111, 1114 (9th Cir. 1996) ("Private citizens may bring suit pursuant to 33 U.S.C. § 1365 to enforce effluent standards or limitations, which are defined as including violations of 33 U.S.C. § 1311(a). 33 U.S.C. § 1365(f)(1).")

59. CWA section 505(a) authorizes third-party enforcement actions for injunctive relief. 33 U.S.C. § 1365(a). Section 505(d) allows a prevailing or substantially prevailing party in an enforcement action to recover litigation costs, including fees for attorneys, experts, and consultants where it finds that such an award is appropriate. 33 U.S.C. § 1365(d).

60. CWA violators are subject to an assessment of civil penalties of up to $64,618 per day per violation for violations occurring after November 2, 2015. 33 U.S.C. § 1319(d); 40 C.F.R. §§ 19.1-19.4.

**C.    Water Quality Standards**

61. Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

62. The State of California regulates water quality through the State Board and nine Regional Boards, and each Regional Board maintains a separate Water Quality Control Plan which contains Water Quality Standards for water bodies within its geographic area.

63. The San Francisco Bay Regional Water Quality Control Board has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, which sets forth the Water Quality Standards and beneficial uses for San Francisco Bay and its tributaries. The Basin Plan is the "master water quality control planning document. It designates beneficial uses and water quality objectives for waters of the State, including surface waters and groundwater" as well as "programs of implementation to achieve water quality objectives." *See* https://www.waterboards.ca.gov/sanfranciscobay/basin_planning.html.

64. The Basin Plan sets forth, among other things, narrative Water Quality Standards for floating material, oil and grease, sediment, settleable matter, and suspended materials. *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21, and Table 3-4.

65. In addition, EPA has promulgated Water Quality Standards for toxic priority pollutants in all California water bodies (the "California Toxics Rule" or "CTR"), which apply to San Francisco Bay and its tributaries, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

66. The Basin Plan also defines beneficial uses. In the Basin Plan, Suisun Bay has beneficial uses for: industrial service supply, industrial process supply, commercial and sport fishing, estuarine habitat, fish migration, preservation of rare and endangered species, fish spawning, wildlife habitat, water contact recreation, noncontact water recreation, and navigation.

67. The beneficial uses of Suisun Marsh Wetlands include estuarine habitat, fish migration, preservation of rare and endangered species, fish spawning, wildlife habitat, water contact recreation, and noncontact water recreation.

68. The beneficial uses of Suisun Slough include commercial and sport fishing, estuarine habitat, fish migration, preservation of rare and endangered species, fish spawning, warm freshwater habitat, wildlife habitat, water contact recreation, noncontact water recreation, and navigation.

69. The beneficial uses of Hill Slough include commercial and sport fishing, estuarine habitat, preservation of rare and endangered species, wildlife habitat, water contact recreation,

noncontact water recreation, and navigation.

70. The beneficial uses of San Pablo Bay include industrial service supply, commercial and sport fishing, shellfish harvesting, estuarine habitat, fish migration, preservation of rare and endangered species, fish spawning, wildlife habitat, water contact recreation, noncontact water recreation, and navigation.

71. The beneficial uses of Wildcat Creek include freshwater replenishment, cold freshwater habitat, fish migration, preservation of rare and endangered species, fish spawning, warm freshwater habitat, wildlife habitat, and water contact recreation.

72. The beneficial uses of Wildcat Creek Wetlands include estuarine habitat, preservation of rare and endangered species, fish spawning, wildlife habitat, water contact recreation, and noncontact water recreation.

73. The beneficial uses of Lower San Francisco Bay include industrial service supply, commercial and sport fishing, shellfish harvesting, estuarine habitat, fish migration, preservation of rare and endangered species, fish spawning, wildlife habitat, water contact recreation, noncontact water recreation, and navigation.

74. The beneficial uses of San Leandro Bay include industrial service supply, estuarine habitat, fish migration, preservation of rare and endangered species, wildlife habitat, water contact recreation, noncontact water recreation, and navigation.

75. The beneficial uses of Arrowhead Wetlands include estuarine habitat, preservation of rare and endangered species, fish spawning, wildlife habitat, water contact recreation, and noncontact water recreation.

76. The beneficial uses of South San Francisco Bay include industrial service supply, commercial and sport fishing, shellfish harvesting, estuarine habitat, fish migration, preservation of rare and endangered species, fish spawning, wildlife habitat, water contact recreation, noncontact water recreation, and navigation.

77. The beneficial uses of Mowry Slough include estuarine habitat, preservation of rare and endangered species, wildlife habitat, water contact recreation, and noncontact water recreation.

78. Stormwater discharges from industrial facilities like Defendants' which cause or contribute to exceedances of Receiving Water Limitations in the Industrial Stormwater Permit and applicable water quality objectives must comply with the Industrial Stormwater Permit, or they violate the Clean Water Act.

### D. The Industrial Stormwater Permit

79. Section 402(p) of the CWA establishes the framework regulating industrial storm water discharges under federal, and authorized state, NPDES permit programs. 33 U.S.C. § 1342(p).

80. Discharges composed entirely of storm water are exempt from the CWA's permitting requirements unless those discharges are associated with "industrial activity." *See* 33 U.S.C. § 1342(p)(1) and (2); *Natural Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1304-05 (9th Cir. 1992) (detailing EPA's regulations regarding "industrial activity" sources). EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permit authorization for facilities engaged in industrial activity that discharge to waters of the United States.

81. Section 402(b) of the Clean Water Act, 33 U.S.C. § 1342(b), establishes a framework for regulating industrial storm water discharges under the NPDES program. States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a single, statewide general NPDES permit applicable to all industrial storm water dischargers. *See* 33 U.S.C. § 1342(b).

82. In California, the State Board is charged with regulating pollutants to protect California's water resources.

83. The Industrial Stormwater Permit is a statewide general NPDES permit issued by the State Board pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342(b), and 40 C.F.R § 123.25. The Industrial Stormwater Permit Order 2014-0057-DWQ as amended in 2015 and 2018 is the currently active Industrial Stormwater Permit for industrial stormwater discharges applicable in California.

84. The State Board elected to issue a statewide general permit applicable to all

stormwater discharges associated with industrial activity. The State Board originally issued the Industrial Stormwater Permit on or about November 19, 1991. The State Board modified the Industrial Stormwater Permit on or about September 17, 1992. Pertinent to this action, the State Board reissued the Industrial Stormwater Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The current version of the Industrial Stormwater Permit went into effect on July 1, 2015.

85.     In order to discharge stormwater lawfully in California, industrial dischargers (i.e., facility operators) must secure coverage under the Industrial Stormwater Permit by filing a notice of intent, and comply with its terms, or obtain and comply with an individual NPDES permit. Industrial Stormwater Permit, §§ I.A (Findings 8, 12, 17), Attachment C (defining "discharger").

86.     Compliance with the Industrial Stormwater Permit constitutes compliance with the CWA for purposes of storm water discharges. 33 U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E). Conversely, "[Industrial Stormwater] Permit noncompliance constitutes a violation of the Clean Water Act and the [California] Water Code." Industrial Stormwater Permit, § XXI.A.

87.     The Industrial Stormwater Permit's Receiving Water Limitations also prohibit stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. *Id*. at § VI.C.

88.     The Industrial Stormwater Permit Receiving Water Limitations prohibit discharges that adversely impact human health or the environment. *Id*. at § VI.B.

89.     The Industrial Stormwater Permit's Receiving Water Limitations also prohibit discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id*. at § VI.A.

90.     The Industrial Stormwater Permit requires dischargers comply with technology-based standards established in the CWA. 33 U.S.C. § 1311(b); Industrial Stormwater Permit, § V.A. The Industrial Stormwater Permit incorporates these technology-based standards as "Effluent Limitations."

91.     The Effluent Limitations require dischargers to reduce or prevent pollutants

associated with industrial activity in storm water discharges through the implementation of pollution controls. For toxic and non-conventional pollutants, this requires the Best Available Technology Economically Achievable ("BAT"). *See* Industrial Stormwater Permit, § V.A; *see also* 40 C.F.R. § 401.15 (listing toxic pollutants, including copper, cadmium, chromium, lead, and zinc).

92. For conventional pollutants this requires the Best Conventional Pollutant Control Technology ("BCT") (collectively, the technology based effluent limitations are referred to as "BAT/BCT"). *See* Industrial Stormwater Permit, § V.A; *see also* 40 C.F.R. § 401.16 (listing conventional pollutants, including COD, TSS, oil and grease, pH, and fecal coliform).

93. Compliance with the BAT/BCT standard requires all dischargers implement pollution control measures—called Best Management Practices ("BMPs")—that reduce or prevent discharges of pollution in their storm water discharge in a manner that reflects best industry practice. EPA developed a set of benchmark pollutant concentrations that are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with the statutory BAT/BCT standard expressed in the Industrial Stormwater Permit's technology-based Effluent Limitations.

94. EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges from Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); Multi-Sector Permit, 86 Fed. Reg. 10269, 10272 (Feb. 19, 2021).

95. According to EPA's Industrial Stormwater Fact Sheet for Sector M, polluted discharges from automobile salvage yards, such as the Facilities, contain polycyclic aromatic hydrocarbons (PAHs), TSS, aluminum, and lead. The Industrial Stormwater Permit recommends these "[i]ndicator parameters" be used to aid compliance evaluations; "[f]or example, [COD] concentrations can indicate the presence of dissolved organic compounds, like residual food from

collected recycling materials." Industrial Stormwater Permit, Fact Sheet § II.J.3.b.

96. The Industrial Stormwater Permit includes Numeric Action Limits (NALs) that are based on EPA's Benchmarks. *Id*. at § I.M (Finding 62). The NALs do not strictly represent technology-based effluent limitations. *Id*. at § I.M (Finding 63). However, they do indicate "the overall pollutant control performance at any given facility." *Id*. at § I.M (Finding 61).

**E.     The Stormwater Pollution Prevention Plan**

97. The Industrial Stormwater Permit requires the preparation and implementation of a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to lawfully continue, industrial activities. Industrial Stormwater Permit, § X. To comply with the Industrial Stormwater Permit, dischargers must have developed and implemented a SWPPP by July 15, 2015, including the description of BMPs that comply with the BAT/BCT standard. *See* Industrial Stormwater Permit, §§ X.B-C.

98. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. *Id*. at § X.G. The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. *Id*. at § X.H. The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id*. at §§ I.D (Finding 32), V.A.

99. The SWPPP must include, among other things, a narrative description and assessment of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs developed and implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges necessary to comply with the Industrial Stormwater Permit; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored,

received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities, and the identification of individuals and their current responsibilities for developing and implementing the SWPPP. *Id*. at §§ X.A-H.

100. A SWPPP must also describe of each industrial process occurring at a facility, and the assessment of potential pollutant sources ("Source Evaluation and Pollutant Assessment"). *See id*. at §§ X.C, X.F, X.G

101. Each of the industrial processes and all industrial activities undertaken at the Facility are pollutant sources that must be described and assessed for their potential contribution of pollutants in storm water discharges in the SWPPP's Source Evaluation and Pollutant Assessment.

102. The Industrial Stormwater Permit also requires facility operators to "properly operate and maintain any facilities and systems of treatment and control … installed or used … to achieve compliance with the conditions of [the Industrial Stormwater Permit]" and requirements of the SWPPP at all times. *Id*. at § XXI.F.

103. The SWPPP and site maps must be evaluated and revised at least annually to ensure ongoing compliance. *Id*. at §§ I.J (Finding 55), X.B.1. Any failure to develop, implement, or revise a comprehensive SWPPP that contains all required elements is a violation of the Industrial Stormwater Permit, and creates liability under the CWA. Industrial Stormwater Permit, § X.B; *see also* Industrial Stormwater Permit, Fact Sheet § II.I.1.

### F. The Monitoring and Implementation Plan

104. Permittees must develop and implement a storm water monitoring and reporting program—called a Monitoring Implementation Plan ("MIP")—prior to conducting, and in order to lawfully continue, industrial activities. *See* Industrial Stormwater Permit, §§ X.I, XI.A-D. The MIP must be included in the SWPPP. *See* Industrial Stormwater Permit, § X.A.8. The objective of the MIP is to detect and measure concentrations of pollutants in a facility's storm water discharges, and to ensure compliance with the Industrial Stormwater Permit's Effluent Limitations and Receiving Water Limitations. *See* Industrial Stormwater Permit, Fact Sheet § II.J.1. A lawful

MIP ensures that BMPs are effectively reducing and/or eliminating pollutants in a facility's storm water discharges, and is evaluated and revised whenever appropriate to ensure ongoing compliance with the Industrial Stormwater Permit. *Id*.

105. Facility operators must complete storm water sampling and analysis. Industrial Stormwater Permit, § XI.B. The Industrial Stormwater Permit requires the collection and analysis of two storm water samples from a Qualifying Storm Event ("QSE") between July 1 and December 31 of each reporting year, and two samples from a QSE between January 1 and June 30 of each reporting year. Each sample must be collected within four hours of the start of a discharge, or the start of facility operations if the QSE occurs within the previous 12-hour period. Industrial Stormwater Permit, § XI.B.5.

106. Permittees must also conduct visual observations at least once a month, and at the same time sampling occurs at each discharge location. Industrial Stormwater Permit, § XI.A. Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, or odor, and identify the source of any pollutants. Industrial Stormwater Permit, § XI.A.2. Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants observed in storm water discharges. Industrial Stormwater Permit, § XI.A.3.

107. The Industrial Stormwater Permit requires dischargers to analyze samples for, among other parameters, TSS, oil and grease, and pH; parameters identified during the pollutant source assessment; parameters identified in Table 1 of the Industrial Stormwater Permit based on the facility's standard industrial classification ("SIC") code, and applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id*. at §§ XI.B.6.a-e.

108. The Industrial Stormwater Permit requires operators of facilities that fall under SIC Code 5015, such as the Facilities, to analyze stormwater samples for iron, lead, and aluminum. *Id*. at Table 1.

109. Dischargers must submit all sampling and analytical results for all samples via the State Board's Stormwater Multiple Application and Report Tracking System ("SMARTS")

database within 30 days of obtaining the results for each sampling event. *Id*. at § XI.B.11.a.

110. Dischargers that fail to develop and implement an adequate MIP that includes both visual observations, and sampling and analysis are in violation of the Industrial Stormwater Permit, and consequently the Clean Water Act. *Id*. at § II.J.3

### G. Exceedance Response Actions Requirements

111. The Industrial Stormwater Permit requires dischargers to complete certain Exceedance Response Actions (ERAs) based on stormwater sampling results in order to assist dischargers in complying with the Industrial Stormwater Permit. *Id*. at § I.M (Finding 64).

112. When the Industrial Stormwater Permit became effective on July 1, 2015, all dischargers were in "Baseline status." *See id*. at § XII.B.

113. A discharger's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate an exceedance of an annual average or instantaneous NAL for that parameter. *Id*. at § XII.C.

114. Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See id*. at § XII.C. By October 1 following commencement of Level 1 status, dischargers are required to "complete an evaluation, with the assistance of a [Qualified Industrial Stormwater Practitioner (QISP)], of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s), and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the [Industrial Stormwater] Permit." *See id*. at §§ XII.C.1.a-c.

115. Based upon this Level 1 status evaluation, the discharger is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via the State Board's Stormwater Multiple Application and Report Tracking System (SMARTS) database a Level 1 ERA Report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See id*. at § XII.C.2.a.i-ii.

116. A discharger in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See id*. at § XII.C.2.a.iii.

117. A discharger in Level 1 status for a parameter will return to Baseline status once the discharger has completed the Level 1 ERA Report and implemented all identified additional BMPs, and results from four consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See id*. at § XII.C.2.b.

118. A discharger in Level 1 status for any parameter changes to Level 2 status on July 1 following the reporting year in which the NAL exceedance(s) occurred for that same parameter. *See id*. at § XII.D. By January 1 following commencement of Level 2 status, the discharger is required to submit via SMARTS a Level 2 ERA Action Plan to address NAL exceedance(s) in the drainage areas where the NAL exceedances occurred. *See id*. at §§ XII.D.1.a-e. The Level 2 ERA Action Plan must include a schedule and detailed description of the tasks required to complete the discharger's selected demonstration(s). *Id*. The discharger is required to submit via SMARTS a Level 2 ERA Technical Report by January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan. *See id*. at §§ XII.D.2.a-c.

119. A discharger must annually update the Level 2 ERA Technical Report based upon additional information, including additional NAL exceedances of the same parameter and same drainage area, facility operational changes, pollutant source(s) changes, and/or information that becomes available via compliance activities. *See id*. at § XII.D.3.c. If there are no changes requiring an update of the Level 2 ERA Technical Report, then the discharger will certify in the Annual Report that there have been no changes warranting updating the Level 2 ERA Technical Report. *See id*. at § XII.D.3.c.

**H.     Annual Reports**

120. The Industrial Stormwater Permit requires dischargers to certify and submit via SMARTS an Annual Report by July 15 following each reporting year. *See id*. at § XVI.A.

121. The Annual Report shall include: a compliance checklist indicating whether a discharger complies with, and has addressed all applicable requirements of the Industrial

Stormwater Permit; an explanation for any non-compliance of requirements within the reporting year; an identification of all revisions made to the SWPPP within the reporting year, and the date of the Annual Evaluation. *See id*. at §§ XVI.B.1-4.

122. Question 3 in the Annual Report asks: "Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?"

123. Question 7 in the Annual Report states: "permitted facilities located within an impaired watershed must assess for potential pollutants that may be present in the facility's industrial stormwater discharge" and instructs permittees to "indicate the presence of the potential pollutant at the facility."

124. Question 8 in the Annual Report asks: "[h]as Discharger included the above pollutants in the SWPPP pollutant source assessment and assessed the need for analytical monitoring for the pollutants?"

## V.  STATEMENT OF FACTS

### A.  PNP Fairfield

1.  PNP Fairfield's Operations and Stormwater Discharges

125. The owners/operators of PNP Fairfield operate Pick N Pull Fairfield 11 located at 4659 Air Base Parkway in Fairfield, California.

126. PNP Fairfield discharges stormwater to the unnamed tributary of Union Creek, then to Union Creek, Hill Slough, Suisun Slough, the Suisun Marsh Wetlands, and finally to Suisun Bay, a sub-embayment of the San Francisco Bay.

127. Suisun Bay and its tributaries, including the unnamed tributary of Union Creek, Union Creek, Hill Slough, and Suisun Slough, as well as the Suisun Marsh Wetlands are waters of the United States and waters of the State.

128. PNP Fairfield is regulated by the Industrial Stormwater Permit.

129. The owners/operators of PNP Fairfield submitted a Notice of Intent to comply with the Industrial Stormwater Permit to the State Board on or around September 27, 2018.

130. Operations at PNP Fairfield generally consist of, but are not limited to, self-service

auto dismantling operations.

131.     The owners/operators of PNP Fairfield have self-identified PNP Fairfield primarily as falling under SIC code 5015.

132.     Operations at PNP Fairfield are causing pollutants to be exposed to rainfall.

133.     Pollutants generated at PNP Fairfield are exposed to stormwater flows.

134.     Activities at the PNP Fairfield generate significant debris and particulate matter, which contain pollutants and settle on surfaces within PNP Fairfield. During rain events, this pollution washes off of those surfaces and into stormwater discharge points, which flow to the unnamed tributary of Union Creek, then to Union Creek, Hill Slough, Suisun Slough, the Suisun Marsh Wetlands, and finally to Suisun Bay.

135.     The types of pollutants that PNP Fairfield releases into the immediate environment are known to include or have the potential to include lead, oil and grease, aluminum, TSS, iron, COD, zinc, cadmium, copper, mercury, selenium, windshield wiper fluid, used oil filters, used absorbent with gasoline, universal e-waste, road flares, oily absorbents and debris, nickel metal hydride battery (EV), mercury switches, lithium-ion batteries (EV), pesticides/herbicides, gasoline, crusher fluid, used oils, lead acid batteries, diesel fuel, and brake fluid, and other pollutants.

136.     PNP Fairfield's sampling results since October 27, 2018, indicate that PNP Fairfield's stormwater discharges have consistently exceeded Benchmarks for TSS, COD, pH, iron, aluminum, copper, lead, and zinc.

137.     PNP Fairfield's sampling results indicate that the PNP Fairfield's discharges are causing or threatening to cause pollution, contamination, and/or nuisance, adversely impact human health or the environment, and violate applicable numeric Water Quality Standards and applicable narrative Water Quality Standards.

138.     Neither PNP Fairfield's past nor current SWPPPs include adequate BMPs designed to reduce pollutant levels in discharges to BAT and BCT levels.

139.     PNP Fairfield's SWPPP fails to include the information required by the Industrial Stormwater Permit. Specifically, PNP Fairfield's Site Map fails to identify the locations of: nearby

water bodies, shipping and receiving areas, material handling and processing areas, and cleaning and material reuse areas, and fails to describe containment structures and the corresponding containment capacities.

140. PNP Fairfield has failed to develop and implement an adequate monitoring and reporting program as required by the Industrial Stormwater Permit. Specifically, PNP Fairfield failed to consistently include cadmium, mercury, zinc, and COD as parameters for lab analysis and failed to consistently analyze its stormwater samples for pH. Additionally, PNP Fairfield failed to consistently collect stormwater samples from its second drainage area.

2. PNP Fairfield's Exceedance Response Action Reports

141. Based on self-reported data from stormwater samples, as of July 1, 2016, PNP Fairfield was in Level 1 status for aluminum and iron based on NAL exceedances during the 2015-2016 reporting period.

142. Based on self-reported data from stormwater samples, as of July 1, 2017, PNP Fairfield was in Level 2 status for aluminum and iron based on NAL exceedances during the 2016-2017 reporting period.

143. Based on self-reported data from stormwater samples, as of July 1, 2018, PNP Fairfield was in Level 2 status for aluminum and iron based on NAL exceedances during the 2017-2018 reporting period.

144. PNP Fairfield's Level 2 status ERA Action Plan for aluminum and iron, submitted on SMARTS in December 2017, recommended additional BMPs.

145. However, the BMPs identified PNP Fairfield's Level 2 status ERA Action Plan were insufficient to prevent NAL exceedances at PNP Fairfield and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Fairfield's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D, as evidenced by the fact that sampling results from the 2017-2018 reporting period showed continued exceedances of aluminum and iron.

146. PNP Fairfield's Level 2 status ERA Technical Report for aluminum and iron, submitted on SMARTS in December 2018, also recommended additional BMPs.

147. However, the BMPs identified in PNP Fairfield's Level 2 status ERA Technical

Report were insufficient to prevent NAL exceedances at PNP Fairfield and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Fairfield's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

148. Based on self-reported data from stormwater samples, and as of July 1, 2019, PNP Fairfield remained in Level 2 status for aluminum and iron based on NAL exceedances during the 2018-2019 reporting period. The NAL exceedances during 2018-2019 also indicate that PNP Fairfield entered into Level 1 status for TSS, COD, and copper:

| Pollutant | 2018-2019 Annual Average | Annual NAL |
|---|---|---|
| Aluminum | 3.52 mg/L | 0.75 mg/L |
| Iron | 9.5 mg/L | 1.0 mg/L |
| TSS | 114 mg/L | 100 mg/L |
| COD | 127 mg/L | 120 mg/L |
| Copper | 0.061 mg/L | 0.0332 mg/L |

149. PNP Fairfield's Level 1 ERA Report for COD, TSS, and copper, submitted on SMARTS in December 2019, also recommended additional BMPs.

150. However, the BMPs identified in PNP Fairfield's Level 1 ERA Report were insufficient to prevent NAL exceedances at PNP Fairfield and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Fairfield's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

151. Based on self-reported data from stormwater samples, and as of July 1, 2020, PNP Fairfield remained in Level 2 status for iron based on NAL exceedances during the 2019-2020 reporting period. The annual average for iron during the 2019-2020 reporting period was 1.2 mg/L (Annual NAL is 1.0 mg/L). Despite having no NAL exceedance for aluminum during the 2019-2020 reporting period, PNP Richmond failed to collect an adequate number of stormwater samples during the 2019-2020 reporting period to return to Baseline status for aluminum.

152. PNP Fairfield's updated Level 2 ERA Technical Report for iron, submitted on

SMARTS in December 2020, also recommended additional BMPs.

153. However, the BMPs identified in PNP Fairfield's updated Level 2 ERA Technical Report were insufficient to prevent NAL exceedances at PNP Fairfield and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Fairfield's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

154. Based on self-reported data from stormwater samples, and as of July 1, 2021, PNP Fairfield remained in Level 2 status for iron based on NAL exceedances during the 2020-2021 reporting period. The annual average for iron during the 2020-2021 reporting period was 3.6 mg/L (Annual NAL is 1.0 mg/L).

155. PNP Fairfield's updated Level 2 ERA Technical Report for iron, submitted on SMARTS in December 2022, also recommended additional BMPs.

156. The lack of NAL exceedances during the 2021-2022 reporting period appears to indicate that the BMPs identified in PNP Fairfield's updated Level 2 ERA Technical Reports were sufficient to prevent NAL exceedances at PNP Fairfield, but self-reported data from stormwater samples collected during the 2022-2023 reporting period indicates continued NAL exceedances for aluminum and iron.

157. Based on self-reported data from stormwater samples, and as of July 1, 2023, PNP Fairfield remained in Level 2 status for aluminum and iron based on NAL exceedances during the 2022-2023 reporting period. The annual average for aluminum during the 2022-2023 reporting period was 1.72 mg/L (Annual NAL is 0.75 mg/L), and the annual average for iron during the 2022-2023 reporting period was 3.93 mg/L (Annual NAL is 1.0 mg/L).

158. PNP Fairfield failed to identify additional BMPs "necessary to prevent future NAL exceedances at PNP Fairfield and to comply with the requirements of [the Industrial Stormwater Permit]" as exceedances continued. *See* Industrial Stormwater Permit, §§ XII.C.1.c, XII.C.2.a.ii.

159. PNP Fairfield's updated Level 2 ERA Technical Report for iron, submitted on SMARTS in December 2023, described additional BMPs implemented in September 2023: expansion of the east and west bioswales with barrier curtain/skimmer anchored a posts; installation of three concrete stormwater drop inlets along the western bioswale; installation of

four stormwater inlets along the eastern bioswale; construction of concrete curbing and v-ditch east of the sales office; construction of a stormwater inlet east of the sales office; construction of a concrete apron and installation of a cleanway drop inlet filter northeast of the concrete crush pad; construction of a concrete apron and installation of a cleanway drop inlet filter northwest of the concrete crush pad; and installation of an oil/water separator north of the western bioswale.

160. However, the BMPs identified in PNP Fairfield's updated Level 2 ERA Technical Report were insufficient to prevent NAL exceedances at PNP Fairfield. *See* Industrial Stormwater Permit, § XII.D.

161. PNP Fairfield failed to identify additional BMPs "necessary to prevent future NAL exceedances at PNP Fairfield and to comply with the requirements of [the Industrial Stormwater Permit]" as exceedances continued. *See* Industrial Stormwater Permit, §§ XII.C.1.c, XII.C.2.a.ii.

3. PNP Fairfield's Annual Reports

162. PNP Fairfield's 2018-2019, 2019-2020, 2020-2021, 2021-2022, and 2022-2023 Annual Reports were certified as "true, accurate, and complete" and in compliance with the Industrial Stormwater Permit.

163. In response to Question 3 in the Annual Report[2], in 2019-2020, PNP Fairfield answered in the affirmative, but only sampled two qualified storm events and did not explain why additional samples were not collected.

164. In response to Question 7 in the Annual Report[3], in 2018-2019 and 2022-2023, PNP Fairfield identified mercury and selenium as present at the facility, and in 2019-2020, 2020-2021, and 2021-2022, PNP Fairfield identified mercury and selenium as not present at the facility, but PNP Fairfield's operations were the same for all five years. Upon information and belief, mercury and selenium are present at the facility.

---

[2] Question 3 in the Annual Report asks: "Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?"

[3] Question 7 in the Annual Report states: "permitted facilities located within an impaired watershed must assess for potential pollutants that may be present in the facility's industrial stormwater discharge" and instructs permittees to "indicate the presence of the potential pollutant at the facility."

165.        In response to Question 8 in the Annual Report[4], in 2018-2019 and 2022-2023, PNP Fairfield answered in the affirmative that it had included the pollutants identified in Question 7 in the facility SWPPP, but selenium was not assessed in PNP Fairfield's SWPPPs.

**B.        PNP Richmond**

1.    <u>PNP Richmond's Operations and Stormwater Discharges</u>

166.        The owners/operators of PNP Richmond operate Pick N Pull Richmond located at 1015 Market Avenue in Richmond, California.

167.        PNP Richmond discharges stormwater to Wildcat Creek, which runs through the middle of the facility, then to San Pablo Bay a sub-embayment of the San Francisco Bay.

168.        San Pablo Bay and its tributaries, including Wildcat Creek, are waters of the United States and waters of the State.

169.        PNP Richmond is regulated by the Industrial Stormwater Permit.

170.        The owners/operators of PNP Richmond submitted a Notice of Intent to comply with the Industrial Stormwater Permit to the State Board on or around September 27, 2018.

171.        Operations at PNP Richmond generally consist of, but are not limited to, self-service auto dismantling operations.

172.        The owners/operators of PNP Richmond have self-identified PNP Richmond primarily as falling under SIC code 5015.

173.        Operations at PNP Richmond are causing pollutants to be exposed to rainfall.

174.        Pollutants generated at PNP Richmond are exposed to stormwater flows.

175.        Activities at PNP Richmond generate significant debris and particulate matter, which contain pollutants and settle on surfaces within PNP Richmond. During rain events, this pollution washes off of those surfaces and into stormwater discharge points, which flow to Wildcat Creek and San Pablo Bay.

176.        The types of pollutants that PNP Richmond releases into the immediate environment are known to include or have the potential to include lead, oil and grease, aluminum,

---

[4] Question 8 in the Annual Report asks: "[h]as Discharger included the above pollutants in the SWPPP pollutant source assessment and assessed the need for analytical monitoring for the pollutants?"

TSS, iron, COD, zinc, cadmium, copper, mercury, selenium, windshield wiper fluid, used oil filters, used absorbent with gasoline, universal e-waste, road flares, oily absorbents and debris, nickel metal hydride battery (EV), mercury switches, lithium-ion batteries (EV), pesticides/herbicides, gasoline, crusher fluid, used oils, lead acid batteries, diesel fuel, and brake fluid, and other pollutants.

177.　　　PNP Richmond's sampling results since October 27, 2018, indicate that PNP Richmond's stormwater discharges have consistently exceeded Benchmarks for TSS, COD, oil and grease, pH, iron, aluminum, copper, lead, and zinc.

178.　　　PNP Richmond's sampling results indicate that PNP Richmond's discharges are causing or threatening to cause pollution, contamination, and/or nuisance, adversely impact human health or the environment, and violate applicable numeric Water Quality Standards and applicable narrative Water Quality Standards.

179.　　　Neither PNP Richmond's past nor current SWPPPs include adequate BMPs designed to reduce pollutant levels in discharges to BAT and BCT levels.

180.　　　PNP Richmond's SWPPP fails to include the information required by the Industrial Stormwater Permit.

181.　　　PNP Richmond has failed to develop and implement an adequate monitoring and reporting program as required by the Industrial Stormwater Permit. Specifically, PNP Richmond failed to include COD as a parameter for lab analysis.

　　　　　2.　 PNP Richmond's Exceedance Response Action Reports

182.　　　Based on self-reported data from stormwater samples, as of July 1, 2016, PNP Richmond was in Level 1 status for iron based on NAL exceedances during the 2015-2016 reporting period.

183.　　　Based on self-reported data from stormwater samples, as of July 1, 2017, PNP Richmond was in Level 1 status for aluminum, copper, zinc, and TSS, and in Level 2 status for iron based on NAL exceedances during the 2016-2017 reporting period.

184.　　　Based on self-reported data from stormwater samples, as of July 1, 2018, PNP Richmond was in Level 2 status for aluminum and iron based on NAL exceedances during the

2017-2018 reporting period.

185. PNP Richmond's Level 2 status ERA Action Plan for iron, submitted on SMARTS in December 2017, recommended additional BMPs.

186. PNP Richmond's Level 2 status ERA Action Plan for aluminum, copper, zinc, and TSS, submitted on SMARTS in December 2018, also recommended additional BMPs.

187. However, the BMPs identified PNP Richmond's Level 2 status ERA Action Plans were insufficient to prevent NAL exceedances at PNP Richmond and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Richmond's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D, as evidenced by the fact that sampling results from the 2017-2018 reporting period showed continued exceedances of aluminum and iron.

188. PNP Richmond's Level 2 status ERA Technical Report for aluminum and iron, submitted on SMARTS in December 2018, also recommended additional BMPs.

189. However, the BMPs identified in PNP Richmond's Level 2 status ERA Technical Report were insufficient to prevent NAL exceedances at PNP Richmond and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Richmond's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

190. Based on self-reported data from stormwater samples, and as of July 1, 2019, PNP Richmond remained in Level 2 status for aluminum and iron based on NAL exceedances during the 2018-2019 reporting period. The annual average for aluminum during the 2018-2019 reporting period was 1.83 mg/L (Annual NAL is 0.75 mg/L), and the annual average for iron during the 2018-2019 reporting period was 1.63 mg/L (Annual NAL is 1.0 mg/L).

191. PNP Richmond's updated Level 2 ERA Technical Report for aluminum and iron, submitted on SMARTS in December 2019, also recommended additional BMPs.

192. However, the BMPs identified in PNP Richmond's updated Level 2 ERA Technical Report were insufficient to prevent NAL exceedances at PNP Richmond and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Richmond's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

193. Based on self-reported data from stormwater samples, and as of July 1, 2020, PNP

Richmond remained in Level 2 status for aluminum and iron based on NAL exceedances during the 2019-2020 reporting period. The annual average for aluminum during the 2019-2020 reporting period was 4.30 mg/L (Annual NAL is 0.75 mg/L), and the annual average for iron during the 2019-2020 reporting period was 6.11 mg/L (Annual NAL is 1.0 mg/L).

194. PNP Richmond's updated Level 2 ERA Technical Reports for aluminum and iron, submitted on SMARTS in August 2020, also recommended additional BMPs.

195. Based on self-reported data from stormwater samples, and as of July 1, 2021, PNP Richmond remained in Level 2 status for aluminum and iron. Despite having no NAL exceedances during the 2020-2021 reporting period, PNP Richmond failed to collect an adequate number of stormwater samples during the 2020-2021 reporting period to return to Baseline status.

196. PNP Richmond's updated Level 2 ERA Technical Reports for aluminum and iron, submitted on SMARTS in December 2021, also recommended additional BMPs.

197. However, the BMPs identified in PNP Richmond's updated Level 2 ERA Technical Reports were insufficient to prevent NAL exceedances at PNP Richmond and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Richmond's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

198. Based on self-reported data from stormwater samples, and as of July 1, 2022, PNP Richmond remained in Level 2 status for aluminum and iron and entered Level 1 status for copper, and TSS, based on NAL exceedances during the 2021-2022 reporting period:

| Pollutant | 2021-2022 Annual Average | Annual NAL |
|---|---|---|
| Aluminum | 6.55 mg/L | 0.75 mg/L |
| Iron | 10.9 mg/L | 1.0 mg/L |
| TSS | 116.25 mg/L | 100 mg/L |
| Copper | 0.04 mg/L | 0.0332 mg/L |

199. PNP Richmond's Level 1 ERA Report for copper, submitted on SMARTS in January 2023, also recommended additional BMPs.

200.     PNP Richmond's updated Level 2 ERA Technical Report for aluminum and iron, submitted on SMARTS in December 2022, also recommended additional BMPs.

201.     However, the BMPs identified in PNP Richmond's updated Level 2 ERA Technical Report and Level 1 ERA Report were insufficient to prevent NAL exceedances at PNP Richmond and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Richmond's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

202.     Based on self-reported data from stormwater samples, and as of July 1, 2023, PNP Richmond remained in Level 2 status for aluminum and iron. The annual average for aluminum during the 2022-2023 reporting period was 2.33 mg/L (Annual NAL is 0.75 mg/L), and the annual average for iron during the 2022-2023 reporting period was 2.69 mg/L (Annual NAL is 1.0 mg/L).

203.     PNP Richmond failed to identify additional BMPs "necessary to prevent future NAL exceedances at PNP Richmond and to comply with the requirements of [the Industrial Stormwater Permit]" as exceedances continued. *See* Industrial Stormwater Permit, §§ XII.C.1.c, XII.C.2.a.ii.

3.  PNP Richmond's Annual Reports

204.     PNP Richmond's 2018-2019, 2019-2020, 2020-2021, 2021-2022, and 2022-2023 Annual Reports were certified as "true, accurate, and complete" and in compliance with the Industrial Stormwater Permit.

205.     In response to Question 3 in the Annual Report[5], in 2019-2020, PNP Richmond answered in the affirmative, but only sampled three qualified storm events and did not explain why additional samples were not collected.

206.     In response to Question 7 in the Annual Report[6], in 2018-2019 and 2022-2023, PNP Richmond identified mercury and selenium as present at the facility, and in 2019-2020,

---

[5] Question 3 in the Annual Report asks: "Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?"

[6] Question 7 in the Annual Report states: "permitted facilities located within an impaired watershed must assess for potential pollutants that may be present in the facility's industrial stormwater discharge" and instructs permittees to "indicate the presence of the potential pollutant at the facility."

2020-2021, and 2021-2022, PNP Richmond identified mercury and selenium as not present at the facility, but PNP Richmond's operations were the same for all five years. Upon information and belief, mercury and selenium are present at the facility.

207. In response to Question 8 in the Annual Report[7], in 2018-2019, PNP Richmond answered in the affirmative that it had included the pollutants identified in Question 7 in the facility SWPPP, but selenium was not assessed in PNP Richmond's SWPPPs.

### C. PNP Oakland

1. PNP Oakland's Operations and Stormwater Discharges

208. The owners/operators of PNP Oakland operate PickNPull Oakland 70 located at 8451 San Leandro Street in Oakland, California.

209. PNP Oakland discharges stormwater to Oakland's municipal separate storm sewer system, then to Elmhurst Creek, and then to San Leandro Bay, near Arrowhead Marsh, then ultimately to Lower San Francisco Bay, a sub-embayment of the San Francisco Bay.

210. Lower San Francisco Bay and its tributaries, Elmhurst Creek and San Leandro Bay, are waters of the United States and waters of the State.

211. PNP Oakland is regulated by the Industrial Stormwater Permit.

212. The owners/operators of PNP Oakland submitted a Notice of Intent to comply with the Industrial Stormwater Permit to the State Board on or around September 27, 2018.

213. Operations at PNP Oakland generally consist of, but are not limited to, self-service auto dismantling operations.

214. The owners/operators of PNP Oakland have self-identified PNP Oakland primarily as falling under SIC code 5015.

215. Operations at PNP Oakland are causing pollutants to be exposed to rainfall.

216. Pollutants generated at PNP Oakland are exposed to stormwater flows.

217. Activities at PNP Oakland generate significant debris and particulate matter, which contain pollutants and settle on surfaces within PNP Oakland. During rain events, this pollution

---

[7] Question 8 in the Annual Report asks: "[h]as Discharger included the above pollutants in the SWPPP pollutant source assessment and assessed the need for analytical monitoring for the pollutants?"

washes off of those surfaces and into stormwater discharge points, which flow to Elmhurst Creek and Lower San Francisco Bay.

218. The types of pollutants that PNP Oakland releases into the immediate environment are known to include or have the potential to include lead, oil and grease, aluminum, TSS, iron, COD, zinc, cadmium, copper, mercury, selenium, windshield wiper fluid, used oil filters, used absorbent with gasoline, universal e-waste, road flares, oily absorbents and debris, nickel metal hydride battery (EV), mercury switches, lithium-ion batteries (EV), pesticides/herbicides, gasoline, crusher fluid, used oils, lead acid batteries, diesel fuel, and brake fluid, and other pollutants.

219. PNP Oakland's sampling results since October 27, 2018, indicate that PNP Oakland's stormwater discharges have consistently exceeded Benchmarks for TSS, COD, pH, iron, aluminum, copper, and lead.

220. PNP Oakland's sampling results indicate that PNP Oakland's discharges are causing or threatening to cause pollution, contamination, and/or nuisance, adversely impact human health or the environment, and violate applicable numeric Water Quality Standards and applicable narrative Water Quality Standards.

221. Neither PNP Oakland's past nor current SWPPPs include adequate BMPs designed to reduce pollutant levels in discharges to BAT and BCT levels.

222. PNP Oakland's SWPPP fails to include the information required by the Industrial Stormwater Permit.

223. PNP Oakland has failed to develop and implement an adequate monitoring and reporting program as required by the Industrial Stormwater Permit. Specifically, PNP Oakland failed to include copper and zinc as parameters for lab analysis.

2. PNP Oakland's Exceedance Response Action Reports

224. Based on self-reported data from stormwater samples, as of July 1, 2016, PNP Oakland was in Level 1 status for aluminum, iron, copper, zinc, COD, and TSS based on NAL exceedances during the 2015-2016 reporting period.

225. Based on self-reported data from stormwater samples, as of July 1, 2018, PNP

Oakland was in Level 2 status for aluminum, iron, and COD based on NAL exceedances during the 2017-2018 reporting period.

226. PNP Oakland's Level 2 status ERA Action Plan for aluminum, iron, and COD, submitted on SMARTS in December 2018, recommended additional BMPs.

227. However, the BMPs identified PNP Oakland's Level 2 status ERA Action Plan were insufficient to prevent NAL exceedances at PNP Oakland and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Oakland's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

228. Based on self-reported data from stormwater samples, and as of July 1, 2019, PNP Oakland remained in Level 2 status for iron and COD based on NAL exceedances during the 2018-2019 reporting period. The annual average for iron during the 2018-2019 reporting period was 2.92 mg/L (Annual NAL is 1.0 mg/L), and the annual average for COD during the 2018-2019 reporting period was 453.33 mg/L (Annual NAL is 120 mg/L).

229. PNP Oakland's Level 2 status ERA Technical Report for iron and COD, submitted on SMARTS in December 2019, also recommended additional BMPs.

230. However, the BMPs identified in PNP Oakland's Level 2 status ERA Technical Report were insufficient to prevent NAL exceedances at PNP Oakland and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Oakland's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

231. Based on self-reported data from stormwater samples, and as of July 1, 2020, PNP Oakland remained in Level 2 status for aluminum, iron, and COD based on NAL exceedances during the 2019-2020 reporting period:

| Pollutant | 2019-2020 Annual Average | Annual NAL |
|---|---|---|
| Aluminum | 2.35 mg/L | 0.75 mg/L |
| Iron | 4.61 mg/L | 1.0 mg/L |
| COD | 702 mg/L | 120 mg/L |

232. PNP Oakland's updated Level 2 ERA Technical Report for aluminum, iron, and

COD, submitted on SMARTS in December 2020, also recommended additional BMPs.

233. Based on self-reported data from stormwater samples, and as of July 1, 2021, PNP Oakland remained in Level 2 status for aluminum, iron, and COD based on NAL exceedances during the 2020-2021 reporting period:

| Pollutant | 2020-2021 Annual Average | Annual NAL |
|---|---|---|
| Aluminum | 1.2 mg/L | 0.75 mg/L |
| Iron | 2.3 mg/L | 1.0 mg/L |
| COD | 210 mg/L | 120 mg/L |

234. PNP Oakland's updated Level 2 ERA Technical Report for aluminum, iron, and COD, submitted on SMARTS in December 2021, also recommended additional BMPs.

235. However, the BMPs identified in PNP Oakland's updated Level 2 ERA Technical Reports were insufficient to prevent NAL exceedances at PNP Oakland and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Oakland's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

236. Based on self-reported data from stormwater samples, and as of July 1, 2022, PNP Oakland remained in Level 2 status for COD, based on NAL exceedances during the 2021-2022 reporting period. The annual average for COD during the 2021-2022 reporting period was 140 mg/L (Annual NAL is 120 mg/L).

237. PNP Oakland's updated Level 2 ERA Technical Report for COD, submitted on SMARTS in December 2022, did not recommend additional BMPs.

238. However, the BMPs identified in PNP Oakland's updated Level 2 ERA Technical Report were insufficient to prevent NAL exceedances at PNP Oakland and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Oakland's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

239. Based on self-reported data from stormwater samples, and as of July 1, 2023, PNP Oakland remained in Level 2 status for iron and COD. The annual average for iron during the 2022-2023 reporting period was 1.66 mg/L (Annual NAL is 1.0 mg/L), and the annual average for

COD during the 2022-2023 reporting period was 285 mg/L (Annual NAL is 120 mg/L).

240. PNP Oakland failed to identify additional BMPs "necessary to prevent future NAL exceedances at PNP Oakland and to comply with the requirements of [the Industrial Stormwater Permit]" as exceedances continued. *See* Industrial Stormwater Permit, §§ XII.C.1.c, XII.C.2.a.ii.

### 3. PNP Oakland's Annual Reports

241. PNP Oakland's 2018-2019, 2019-2020, 2020-2021, 2021-2022, and 2022-2023 Annual Reports were certified as "true, accurate, and complete" and in compliance with the Industrial Stormwater Permit.

242. In response to Question 7 in the Annual Report[8], in 2018-2019 and 2022-2023, PNP Oakland identified mercury and selenium as present at the facility, and in 2019-2020, 2020-2021, and 2021-2022, PNP Oakland identified mercury and selenium as not present at the facility, but PNP Oakland's operations were the same for all five years. Upon information and belief, mercury and selenium are present at the facility.

243. In response to Question 8 in the Annual Report[9], in 2018-2019 and 2022-2023, PNP Oakland answered in the affirmative that it had included the pollutants identified in Question 7 in the facility SWPPP, but mercury and selenium were not assessed in PNP Oakland's SWPPPs.

### D. PNP Newark

#### 1. PNP Newark's Operations and Stormwater Discharges

244. The owners/operators of PNP Newark operate Pick-N-Pull Newark #43 located at 7400 Mowry Avenue in Newark, California.

245. PNP Newark discharges stormwater to a marshy area which drains to Mowry Slough, which ultimately drains to South San Francisco Bay at the Don Edwards San Francisco Bay National Wildlife Refuge. PNP Newark also discharges stormwater to Mowry Avenue and then to the Newark municipal separate storm sewer system.

---

[8] Question 7 in the Annual Report states: "permitted facilities located within an impaired watershed must assess for potential pollutants that may be present in the facility's industrial stormwater discharge" and instructs permittees to "indicate the presence of the potential pollutant at the facility."

[9] Question 8 in the Annual Report asks: "[h]as Discharger included the above pollutants in the SWPPP pollutant source assessment and assessed the need for analytical monitoring for the pollutants?"

246. South San Francisco Bay and its tributaries, including Mowry Slough and its surrounding marshy areas and wetlands, are waters of the United States and waters of the State.

247. PNP Newark is regulated by the Industrial Stormwater Permit.

248. The owners/operators of PNP Newark submitted a Notice of Intent to comply with the Industrial Stormwater Permit to the State Board on or around September 27, 2018.

249. Operations at PNP Newark generally consist of, but are not limited to, self-service auto dismantling operations.

250. The owners/operators of PNP Newark have self-identified PNP Newark primarily as falling under SIC code 5015.

251. Operations at PNP Newark are causing pollutants to be exposed to rainfall.

252. Pollutants generated at PNP Newark are exposed to stormwater flows.

253. Activities at PNP Newark generate significant debris and particulate matter, which contain pollutants and settle on surfaces within PNP Newark. During rain events, this pollution washes off of those surfaces and into stormwater discharge points, which flow to Mowry Slough and South San Francisco Bay.

254. The types of pollutants that PNP Newark releases into the immediate environment are known to include or have the potential to include lead, oil and grease, aluminum, TSS, iron, COD, zinc, cadmium, copper, mercury, selenium, windshield wiper fluid, used oil filters, used absorbent with gasoline, universal e-waste, road flares, oily absorbents and debris, nickel metal hydride battery (EV), mercury switches, lithium-ion batteries (EV), pesticides/herbicides, gasoline, crusher fluid, used oils, lead acid batteries, diesel fuel, and brake fluid, and other pollutants.

255. PNP Newark's sampling results since October 27, 2018, indicate that PNP Newark's stormwater discharges have consistently exceeded Benchmarks for TSS, pH, iron, aluminum, and copper.

256. PNP Newark's sampling results indicate that PNP Newark's discharges are causing or threatening to cause pollution, contamination, and/or nuisance, adversely impact human health or the environment, and violate applicable numeric Water Quality Standards and applicable

narrative Water Quality Standards.

257. Neither PNP Newark's past nor current SWPPPs include adequate BMPs designed to reduce pollutant levels in discharges to BAT and BCT levels.

258. PNP Newark's SWPPP fails to include the information required by the Industrial Stormwater Permit.

259. PNP Newark has failed to develop and implement an adequate monitoring and reporting program as required by the Industrial Stormwater Permit. Specifically, PNP Newark failed to consistently analyze its stormwater samples for copper and zinc and failed to include COD as a parameter for lab analysis.

        2. PNP Newark's Exceedance Response Action Reports

260. Based on self-reported data from stormwater samples, as of July 1, 2016, PNP Newark was in Level 1 status for aluminum and iron based on NAL exceedances during the 2015-2016 reporting period.

261. Based on self-reported data from stormwater samples, as of July 1, 2017, PNP Newark was in Level 2 status for aluminum and iron based on NAL exceedances during the 2016-2017 reporting period.

262. Based on self-reported data from stormwater samples, as of July 1, 2018, PNP Newark was in Level 2 status for aluminum and iron based on NAL exceedances during the 2017-2018 reporting period.

263. PNP Newark's Level 2 status ERA Action Plan for aluminum and iron, submitted on SMARTS in December 2017, recommended additional BMPs.

264. However, the BMPs identified PNP Newark's Level 2 status ERA Action Plan were insufficient to prevent NAL exceedances at PNP Newark and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Newark's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D, as evidenced by the fact that sampling results from the 2017-2018 reporting period showed continued exceedances of aluminum and iron.

265. PNP Newark's Level 2 status ERA Technical Report for aluminum and iron, submitted on SMARTS in December 2018, also recommended additional BMPs.

266. However, the BMPs identified in PNP Newark's Level 2 status ERA Technical Report were insufficient to prevent NAL exceedances at PNP Newark and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Newark's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

267. Based on self-reported data from stormwater samples, and as of July 1, 2019, PNP Newark remained in Level 2 status for aluminum and iron based on NAL exceedances during the 2018-2019 reporting period. The annual average for aluminum during the 2018-2019 reporting period was 1.15 mg/L (Annual NAL is 0.75 mg/L), and the annual average for iron during the 2018-2019 reporting period was 3.2 mg/L (Annual NAL is 1.0 mg/L).

268. PNP Newark's Level 1 ERA Report for copper and TSS and updated Level 2 ERA Technical Report for aluminum and iron, submitted on SMARTS in December 2019, also recommended additional BMPs.

269. However, the BMPs identified in PNP Newark's Level 1 ERA Report and updated Level 2 ERA Technical Report were insufficient to prevent NAL exceedances at PNP Newark and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Newark's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

270. Based on self-reported data from stormwater samples, and as of July 1, 2020, PNP Newark remained in Level 2 status for aluminum and iron. Despite having no NAL exceedances during the 2019-2020 reporting period, PNP Newark failed to collect an adequate number of stormwater samples during the 2019-2020 reporting period to return to Baseline status.

271. PNP Newark's updated Level 2 ERA Technical Reports for aluminum and iron, submitted on SMARTS in December 2020, also recommended additional BMPs.

272. No stormwater samples were collected during the 2020-2021 reporting period, so as of July 1, 2021, PNP Newark remained in Level 2 status for aluminum and iron.

273. PNP Newark failed to submit an updated Level 2 ERA Technical Reports for aluminum and iron in 2021.

274. Based on self-reported data from stormwater samples, and as of July 1, 2022, PNP Newark remained in Level 2 status for aluminum and iron, based on NAL exceedances during the

2021-2022 reporting period. The annual average for aluminum during the 2021-2022 reporting period was 0.83 mg/L (Annual NAL is 0.75 mg/L), and the annual average for iron during the 2021-2022 reporting period was 1.43 mg/L (Annual NAL is 1.0 mg/L).

275.     PNP Newark's updated Level 2 ERA Technical Report for aluminum and iron, submitted on SMARTS in December 2022, also recommended additional BMPs.

276.     However, the BMPs identified in PNP Newark's updated Level 2 ERA Technical Report and Level 1 ERA Report were insufficient to prevent NAL exceedances at PNP Newark and, in fact, did not achieve adequate reductions in pollutant concentrations in PNP Newark's stormwater discharges. *See* Industrial Stormwater Permit, § XII.D.

277.     Based on self-reported data from stormwater samples, and as of July 1, 2023, PNP Newark remained in Level 2 status for aluminum and iron. The annual average for aluminum during the 2022-2023 reporting period was 1.3 mg/L (Annual NAL is 0.75 mg/L), and the annual average for iron during the 2022-2023 reporting period was 1.79 mg/L (Annual NAL is 1.0 mg/L).

278.     PNP Newark failed to identify additional BMPs "necessary to prevent future NAL exceedances at PNP Newark and to comply with the requirements of [the Industrial Stormwater Permit]" as exceedances continued. *See* Industrial Stormwater Permit, §§ XII.C.1.c, XII.C.2.a.ii.

3.  PNP Newark's Annual Reports

279.     PNP Newark's 2018-2019, 2019-2020, 2020-2021, 2021-2022, and 2022-2023 Annual Reports were certified as "true, accurate, and complete" and in compliance with the Industrial Stormwater Permit.

280.     In response to Question 3 in the Annual Report[10], in 2019-2020, PNP Newark answered in the affirmative, but only sampled one qualified storm event and did not explain why additional samples were not collected.

281.     In response to Question 7 in the Annual Report[11], in 2018-2019, 2019-2020, 2020-

[10] Question 3 in the Annual Report asks: "Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?"

[11] Question 7 in the Annual Report states: "permitted facilities located within an impaired watershed must assess for potential pollutants that may be present in the facility's industrial stormwater discharge" and instructs permittees to "indicate the presence of the potential pollutant at the facility."

2021, 2021-2022, and 2022-2023, PNP Newark failed to identify mercury and selenium as present at the facility, but PNP Newark's operations were the same as PNP Fairfield, PNP Richmond and PNP Oakland for all five years. Upon information and belief, mercury and selenium are present at the facility.

### E. Activities Contributing to CWA Violations

282. Defendants have not developed and/or implemented adequate SWPPPs at the Facilities.

283. Defendants have not developed and/or implemented BMPs that adequately minimize the exposure of pollutants to stormwater at the Facilities.

284. Defendants have not developed and/or implemented BMPs at the Facilities that adequately control and minimize polluted runoff from the Facilities.

285. Defendants have not developed and/or implemented BMPs at the Facilities that adequately treat and remove pollutants in stormwater prior to discharge.

286. Defendants have not developed and/or implemented adequate measures to reduce or eliminate stormwater pollution that constitute BAT/BCT.

287. Defendants have not developed and/or implemented adequate BMPs at the Facilities to achieve stormwater discharges that meet Benchmarks, NALs, and/or applicable Water Quality Standards.

288. Defendants have not adequately evaluated and revised the Facilities' SWPPPs to address these failures.

289. Defendants have failed to properly operate and maintain the structures and systems that have been put in place at the Facilities to achieve compliance with the Industrial Stormwater Permit and its SWPPP requirements.

290. Defendants have not developed and/or implemented an adequate monitoring and reporting program at the Facilities.

291. Defendants' monitoring and reporting activities have not resulted in practices that adequately reduce or prevent pollutants from discharging from the stormwater flows from the Facilities.

292. Defendants' monitoring activities have not effectively identified compliance problems at the Facilities or resulted in effective revisions of the SWPPPs.

293. Due to Defendants' lack of effective pollution prevention measures, including effective BMPs, and their failure to implement an effective monitoring and reporting program, stormwater from the Facilities becomes polluted with many constituents. Pollutants become entrained in stormwater when such water flows over and across the outdoor areas of the Facilities.

294. Defendants' annual stormwater sampling results indicate that the Facilities' discharges of stormwater are consistently contaminated with higher levels of pollutants than are permissible under the Industrial Stormwater Permit and the CWA.

295. Defendants' annual stormwater sampling results indicate that the Facilities' discharges of stormwater are regularly contaminated with higher levels of pollutants than are consistent with BMPs that constitute BAT/BCT.

296. Defendants' repeated stormwater exceedances of Benchmarks since October 27, 2018, for pollutants, including TSS, COD, oil and grease, pH, iron, aluminum, copper, lead, and zinc, indicate that Defendants have failed and continue to fail to meet BAT/BCT and applicable Water Quality Standards.

297. Defendants have not developed and/or implemented adequate Level 2 status ERA Technical Reports at the Facilities for aluminum, iron, or COD.

298. Defendants have certified the Facilities' Annual Reports as "true, accurate, and complete" and in compliance with the Industrial Stormwater Permit, but have repeatedly provided false responses to questions in the Annual Reports.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Discharges in Excess of Effluent Limitations in Violation of the

### Industrial Stormwater Permit and the Clean Water Act

### (Violations of 33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))

### (Against All Defendants)

299. Plaintiff incorporates the allegations contained in all other paragraphs as though

fully set forth herein.

300. The CWA and the Industrial Stormwater Permit include effluent limitations, which prohibit the discharge of pollutants from the Facilities in concentrations above the level commensurate with the application of BAT for toxic pollutants and BCT for conventional pollutants.

301. Defendants have discharged and continue to discharge stormwater from the Facilities containing levels of pollutants that do not achieve compliance with the BAT/BCT requirements during every significant rain event (defined by EPA as a rainfall event generating 0.1 inches or more of rain) occurring from October 27, 2018, through the present. *See* Exhibit 1, Notice Letter at Attachment 3. Defendants' failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions attainable via BAT or BCT at the Facilities is a violation of the Industrial Stormwater Permit and the CWA. *See* Industrial Stormwater Permit, §§ I.D (Finding 32), V.A; 33 U.S.C. § 1311(b).

302. Each day, since at least October 27, 2018, that Defendants have discharged stormwater from the Facilities containing pollutants in excess of BAT/BCT requirements is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

303. Defendants' CWA violations described in the paragraphs above will continue in the future, as violations of Sections I.D and V.A of the Industrial Stormwater Permit, until Defendants develop and implement BMPs at the Facilities adequate to achieve pollutant discharge reductions attainable via BAT and BCT.

304. By committing the acts and omissions alleged above after November 2, 2015, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA in the amount of up to $64,618 per day.

305. An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

306. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an

actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

**SECOND CAUSE OF ACTION**

**Discharges in Excess of Receiving Water Limitations in Violation of the Industrial Stormwater Permit and the Clean Water Act**

**(Violations of 33 U.S.C. §§ 1311, 1342, 1365(a), and 1365(f))**

**(Against All Defendants)**

307. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

308. Receiving Water Limitations of the Industrial Stormwater Permit prohibit stormwater discharges from causing or threatening to cause pollution, contamination, or nuisance. *See* Industrial Stormwater Permit, § VI.C.

309. Receiving Water Limitations of the Industrial Stormwater Permit require that stormwater discharges and authorized non-stormwater discharges shall not adversely impact human health or the environment. *See id*. at § VI.B.

310. Finally, Receiving Water Limitations of the Industrial Stormwater Permit prohibit discharges that cause or contribute to a violation of any water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id*. at § VI.A.

311. Since at least October 27, 2018, Defendants have been discharging polluted stormwater from the Facilities in violation of the Receiving Water Limitations of the Industrial Stormwater Permit during every significant rain event (defined by EPA as a rainfall event generating 0.1 inches or more of rain). *See* Exhibit 1, Notice Letter at Attachment 3.

312. The polluted stormwater discharged from the Facilities during every significant rain event contains pollutants harmful to fish, plants, birds, and human health that have adversely affected, and continue to adversely affect, human health and the environment in violation of Section VI.B of the Industrial Stormwater Permit.

313. Discharges of polluted stormwater from the Facilities have in the past caused, and

will continue to cause, pollution, contamination, and/or nuisance to the waters of the United States in violation of Section VI.C of the Industrial Stormwater Permit.

314. Discharges of polluted stormwater from the Facilities have in the past caused, and will continue to cause or contribute to violations of the Water Quality Standards set forth in the Basin Plan in violation of Section VI.A of the Industrial Stormwater Permit.

315. Each and every violation of Section IV.B's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

316. Each and every violation of Section IV.C's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

317. Each and every violation of Section IV.A's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

318. By committing the acts and omissions alleged above after November 2, 2015, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA in the amount of up to $64,618 per day.

319. An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

320. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## THIRD CAUSE OF ACTION

### Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Industrial Stormwater Permit

### (Violations of 33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))

### (Against All Defendants)

321. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

322. The Industrial Stormwater Permit requires dischargers of stormwater associated with industrial activity to develop and implement an adequate SWPPP when they commence industrial activity. Industrial Stormwater Permit, § X.B.

323. Defendants, as of October 27, 2018, have commenced industrial activity and continue to conduct industrial activity at the Facilities.

324. Defendants have failed and continue to fail to develop and implement adequate SWPPPs or implement all necessary revisions to the SWPPPs for the Facilities as required by the Industrial Stormwater Permit.

325. Defendants have failed and continue to fail to develop or implement SWPPPs for the Facilities that include BMPs adequate to meet the requirements of Section X of the Industrial Stormwater Permit.

326. Defendants have failed and continue to fail to adequately develop or implement SWPPPs at the Facilities that prevent discharges from violating the Receiving Water Limitations and Effluent Limitations of the Industrial Stormwater Permit.

327. Each and every violation of the Industrial Stormwater Permit's SWPPP requirements at the Facilities is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

328. Defendants have been in violation of the Industrial Stormwater Permit's SWPPP requirements every day since October 27, 2018. Defendants will continue to be in violation of the SWPPP requirements each day that Defendants fail to develop and fully implement adequate SWPPPs for the Facilities.

329. By committing the acts and omissions alleged above after November 2, 2015, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA in the amount of up to $64,618 per day.

330. An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

331. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

**FOURTH CAUSE OF ACTION**

**Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Program in Violation of the Industrial Stormwater Permit and the Clean Water Act**

**(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

**(Against All Defendants)**

332. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

333. The Industrial Stormwater Permit requires dischargers of stormwater associated with industrial activity to develop and implement a stormwater monitoring and reporting program, called a Monitoring and Implementation Plan (MIP), prior to commencing industrial activity. Industrial Stormwater Permit, §§ X.I, XI.A-D.

334. Defendants have failed and continue to fail to adequately develop, implement, or revise qualifying and adequate MIPs for the Facilities in violation of the Industrial Stormwater Permit and CWA.

335. Defendants have been in violation of the Industrial Stormwater Permit's MIP requirements every day since October 27, 2018. Defendants will continue to be in violation of the MIP requirements each day that Defendants fail to develop and fully implement adequate MIPs for the Facilities.

336. Each and every violation of the Industrial Stormwater Permit's Monitoring Implementation Program requirements at the Facilities is a separate and distinct violation of the CWA.

337. By committing the acts and omissions alleged above after November 2, 2015, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA in the amount of up to $64,618 per day.

338. An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. §

1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

339. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## FIFTH CAUSE OF ACTION

### Failure to Submit Adequate Exceedance Response Action Reports in Violation of the Industrial Stormwater Permit and the Clean Water Act

### (Violations of U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))

### (Against All Defendants)

340. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

341. Plaintiff is informed and believes, and thereon alleges, that Defendants have submitted inadequate Level 2 ERA Technical Reports for aluminum, iron, and COD.

342. Defendants' violations of the Level 2 status ERA requirements of the Industrial Permit and the CWA are ongoing and continuous.

343. Every day Defendants conduct operations at the Facilities without adequate Level 2 ERA Technical Reports is a separate and distinct violation of the Industrial Stormwater Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

344. Defendants have been in daily and continuous violation of the Industrial Stormwater Permit Level 2 status ERA requirements every day since at least October 27, 2018.

345. By committing the acts and omissions alleged above after November 2, 2015, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA in the amount of up to $64,618 per day.

346. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and Plaintiff's members, for which harm Plaintiff has no plain,

speedy, or adequate remedy at law.

347. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays judgment against the Defendants as set forth hereafter.

## SIXTH CAUSE OF ACTION

### False Certification of Annual Reports in Violation of the Industrial Stormwater Permit and the Clean Water Act

### (Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))

### (Against All Defendants)

348. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

349. The Industrial Stormwater Permit requires dischargers to certify and submit via SMARTS an Annual Report by July 15 of each reporting period. Industrial Stormwater Permit, § XVI.A.

350. The Annual Report must include a compliance checklist indicating compliance with applicable Industrial Stormwater Permit requirements and explanations for any non-compliance with Industrial Stormwater Permit requirements. Industrial Stormwater Permit, §§ XVI.B.1-2.

351. Plaintiff is informed and believes, and thereon alleges, that for the 2019-2020 reporting year, PNP Fairfield, PNP Richmond, and PNP Newark answered Question 3 in their Annual Reports, in the affirmative, but did not collect the required number of stormwater samples. They certified the reports as in compliance with the Industrial Stormwater Permit.

352. Plaintiff is informed and believes, and thereon alleges, that for the 2019-2020, 2020-2021, and 2021-2022 reporting years, PNP Fairfield, PNP Richmond, and PNP Oakland falsely certified their responses to Question 7, asserting mercury and selenium were not present at the Facilities despite asserting the opposite in the 2018-2019 and 2022-2023 reporting years. Defendants certified the reports as in compliance with the Industrial Stormwater Permit.

353. Plaintiff is informed and believes, and thereon alleges, that for the 2018-2019,

2019-2020, 2020-2021, 2021-2022, and 2022-2023 reporting years, PNP Newark falsely certified its responses to Question 7, asserting mercury and selenium were not present at the facility, despite PNP Newark's operations being the same as PNP Fairfield, PNP Richmond, and PNP Oakland. Defendants certified the reports as in compliance with the Industrial Stormwater Permit.

354. Plaintiff is informed and believes, and thereon alleges, that for the 2018-2019 reporting year, PNP Fairfield, PNP Richmond, and PNP Newark, and also PNP Fairfield and PNP Oakland for the 2022-2023 reporting period, answered Question 8 in their Annual Reports, in the affirmative, but did not assess selenium in their respective SWPPPs. Defendants certified the reports as in compliance with the Industrial Stormwater Permit.

355. Every day Defendants conduct operations at the Facilities with falsely certified Annual Reports is a separate and distinct violation of the Industrial Stormwater Permit and section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

356. Defendants have been in daily and continuous violation of the Industrial Stormwater Permit's Annual Report requirements every day since at least October 27, 2018.

357. By committing the acts and omissions alleged above after November 2, 2015, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA in the amount of up to $64,618 per day.

358. An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

359. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

### SEVENTH CAUSE OF ACTION

### Violation of Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

### (Cal. Fish & Game Code §§ 5650 and 5652)

### (Against All Defendants)

360. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

361. When contaminated stormwater is discharged from the Facilities, heavy metals, TSS, COD, oil and grease, and other pollutants are deposited into the respective receiving waters.

362. Defendants permit heavy metals, such as copper, lead, and zinc, TSS, COD, oil and grease, and other pollutants to pass into the receiving waters via stormwater discharges from the Facilities.

363. Depositing, allowing to pass into, or placing in a way that permits passage of any substance or material deleterious to fish, plant life, mammals, or bird life into waters of the state is illegal and unlawful in California under Fish and Game Code section 5650(a)(6).

364. Heavy metals, such as copper, lead, and zinc, TSS, COD, oil and grease, and other pollutants are deleterious to fish, plant life, mammals, or bird life.

365. Depositing, allowing to pass into, or placing in a way that permits passage of any waste into waters of the state is illegal and unlawful in California under Fish and Game Code section 5652(a).

366. The receiving waters are waters of the State of California in addition to being waters of the United States.

367. Anything Defendants allow to leave or discharge from the Facilities is waste.

368. Defendants' violations of Fish and Game Code sections 5650 and 5652, the Industrial Stormwater Permit, and the Clean Water Act each constitute unlawful conduct under Business and Professions Code section 17200.

369. Each Defendant is a person. *See* Bus. & Prof. Code § 17201.

370. Baykeeper and its members have been and will continue to suffer injury and harm as a result of Defendants' unlawful conduct. Baykeeper has suffered injury in fact and monetary harm because it has dedicated resources to investigating and stopping Defendants' conduct that would not have been necessary but for Defendants' illegal actions and which could have been used on other matters.

371. Defendants' ongoing pollution of heavy metals, TSS, COD, oil and grease, and

other pollutants into the receiving waters frustrates Baykeeper's mission.

372. This Court has jurisdiction to enjoin Defendants' unlawful conduct that violates Fish and Game Code § 5650(a)(6) under Business and Professions Code section 17203.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## EIGHTH CAUSE OF ACTION

### Violation of Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

### (Cal. Fish & Game Code § 1602)

### (Against Owners/Operators of PNP Fairfield, PNP Richmond, and PNP Oakland)

373. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

374. When contaminated stormwater is discharged from PNP Fairfield, PNP Richmond, and PNP Oakland, heavy metals, such as copper, lead, and zinc, TSS, COD, oil and grease, and other pollutants are deposited into the respective receiving waters.

375. The owners/operators of PNP Fairfield, PNP Richmond, and PNP Oakland permit heavy metals, TSS, COD, oil and grease, and other pollutants to pass into the receiving waters via stormwater discharges from the Facilities.

376. The receiving waters are rivers, streams, or lakes.

377. Depositing or disposing of waste where it may pass into any river stream or lake without notification of the discharge to the California Department of Fish and Wildlife, as well as approval of that notification, is prohibited in California under Fish and Game Code section 1602(a)(1)-(4).

378. Plaintiff was unable to find any Fish and Game Code section 1602 notifications for PNP Fairfield, PNP Richmond, or PNP Oakland.

379. The owners/operators of PNP Fairfield, PNP Richmond, and PNP Oakland's violations of Fish and Game Code section 1602, the Industrial Stormwater Permit, and the Clean Water Act each constitute unlawful conduct under Business and Professions Code section 17200.

380. Each owner/operator of PNP Fairfield, PNP Richmond, and PNP Oakland is a person. *See* Bus. & Prof. Code § 17201.

COMPLAINT 56

381. Baykeeper and its members have been and will continue to suffer injury and harm as a result of the owners/operators of PNP Fairfield, PNP Richmond, and PNP Oakland's unlawful conduct. Baykeeper has suffered injury in fact and monetary harm because it has dedicated resources to investigating and stopping the owners/operators of PNP Fairfield, PNP Richmond, and PNP Oakland's conduct that would not have been necessary but for the owners/operators of PNP Fairfield, PNP Richmond, and PNP Oakland's illegal actions and which could have been used on other matters.

382. The owners/operators of PNP Fairfield, PNP Richmond, and PNP Oakland's ongoing pollution of heavy metals, TSS, COD, oil and grease, and other pollutants into the receiving waters frustrates Baykeeper's mission.

383. This Court has jurisdiction to enjoin the owners/operators of PNP Fairfield, PNP Richmond, and PNP Oakland unlawful conduct that violates Fish and Game Code § 1602 under Business and Professions Code section 17203.

WHEREFORE, Plaintiff prays for judgment against the owners/operators of PNP Fairfield, PNP Richmond, and PNP Oakland as set forth below.

## VII. PRAYER FOR RELIEF

Plaintiff respectfully requests this Court to grant the following relief:

1. Judgment for Plaintiff in this matter enjoining Defendants from discharging pollutants from the Facilities to stormwater discharge points, which discharge to the unnamed tributary of Union Creek, Union Creek, Hill Slough, Suisun Slough, Suisun Marsh Wetlands, Suisun Bay, Wildcat Creek, San Pablo Bay, Elmhurst Creek, San Leandro Bay, Mowry Slough, and San Francisco Bay.

2. A Court Order declaring:

    a. Defendants to have violated and to be in violation of the Clean Water Act for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology requirements;

    b. Defendants to have violated and to be in violation of the Clean Water Act

for discharging pollutants from the Facility in violation of the Industrial Stormwater Permit's Receiving Water Limitations;

c. Defendants to have violated and to be in violation of the Clean Water Act for failing to develop, implement, and/or revise adequate SWPPPs under the Industrial Stormwater Permit;

d. Defendants to have violated and to be in violation of the Clean Water Act for failing to develop, implement, and/or revise adequate MIPs under the Industrial Stormwater Permit;

e. Defendants to have violated and to be in violation of the Clean Water Act for failing comply with Industrial Stormwater Permit Level 1 status ERA requirements;

f. Defendants to have violated and to be in violation of the Clean Water Act for failing comply with Industrial Stormwater Permit Level 2 status ERA requirements;

g. Defendants to have violated and to be in violation of the Clean Water Act for falsely certifying their Annual Reports under the Industrial Stormwater Permit; and

h. Defendants have violated and continue to violate California Fish and Game Code sections 5650(a)(6), 5652(a), and 1602(a)(1)-(4).

3. A Court Order ordering Defendants to restore all receiving waters damaged by Defendants' illegal discharges of pollutants from the Facilities;

4. A Court Order enjoining Defendants from violating sections 301(a) and (b) and section 402(p) of the Clean Water Act and from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facilities;

5. A Court Order enjoining Defendants from continuing their violations of Fish and Game Code sections 5650 and 5652 pursuant to Business and Professions Code section 17203;

6. A Court Order ordering the owners/operators of PNP Fairfield, PNP Richmond, and PNP Oakland to submit a notification to the California Department of Fish and Game for a

COMPLAINT                                                                                                    58

Lake and Streambed Alteration Agreement pursuant to California Fish and Game Code section 1602 for PNP Fairfield, PNP Richmond, and PNP Oakland;

7. A Court Order assessing civil monetary penalties for each violation of the CWA in the amount of $64,618.00 per day per violation;

8. A Court Order awarding Plaintiff its reasonable costs of suit, including attorney, witness, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and California Code of Civil Procedure section 1021.5; and

9. Award other relief as this Court may deem just and appropriate.

Dated: February 20, 2024

Respectfully Submitted,

SAN FRANCISCO BAYKEEPER

/s/ Nicole C. Sasaki

Nicole C. Sasaki
Eric J. Buescher

Attorneys for Plaintiff